UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CAMERON ATHAY, JESSICA ATHAY,

Plaintiffs,

v.

STATE OF WASHINGTON, et al.,

Defendants.

CASE NO. 3:22-CV-5422-JHC-DWC

REPORT AND RECOMMENDATION

Noting Date: September 15, 2023

The District Court has referred this action to United States Magistrate Judge David W. Christel. Plaintiffs Cameron Athay and Jessica Athay bring state law claims, and Cameron brings 42 U.S.C. § 1983 claims for alleged violation his Eighth Amendment rights.[1] Before the Court is Defendants' motion for summary judgment. Dkt. 33. For the reasons discussed below, the Court recommends Defendants' motion be GRANTED in part. The Court recommends Cameron's

[1] The Court will refer to Cameron Athay and Jessica Athay individually by their first names and refer them jointly as "Plaintiffs" to avoid confusion.

42 U.S.C. § 1983 claims be DISMISSED with prejudice[2]; the Court further recommends supplemental jurisdiction over Plaintiffs' state law claims be declined, and those claims be REMANDED to the state court.

## I. BACKGROUND

### A. Procedural History

Cameron, a prisoner housed at the Monroe Correctional Complex ("MCC") filed this action in state court alleging Defendants violated his state law and Eighth Amendment rights when he collided with a locked full-length metal turnstile near Tower 9 at MCC, breaking two teeth. Dkt. 17. Plaintiffs initiated this lawsuit in the Washington State Superior Court for Thurston County ("Thurston County Superior Court") on May 5, 2022. Dkt. 1-2. On June 9, 2022, Defendants removed the case to this Court. Dkt. 1. With the leave of the Court, Plaintiffs filed an Amended Complaint on October 11, 2022, which is the controlling complaint in this matter. Dkt. 17.

The Amended Complaint alleges Eighth Amendment claims pursuant to § 1983 for excessive force and deliberate indifference to Cameron's medical needs. Dkt. 17 at 4. The Amended Complaint also brings state common law claims for negligence, assault and battery, and loss of consortium. *Id.* at 2–3. The State of Washington and corrections officer Matthew Cammer are named as defendants. *Id.*[3] Plaintiffs seeks monetary damages. Dkt. 17 at 5.

---

[2] Cameron asserts state common law claims for negligence (First Claim for Relief) and the intentional tort of assault and battery (Second Claim for Relief). Dkt. 17. Cameron and Jessica assert a state claim for the tort of loss of consortium. *Id.* at ¶4.2. Cameron asserts § 1983 claims for physical abuse and excessive use of force (Third Claim for Relief) and cruel and unusual punishment and denial, delay and withholding of medical case (Fourth Claim for Relief).

[3] The Amended Complaint also names several "John Doe" defendants, who have not been identified or served with process.

The parties have completed discovery and Defendants have filed a motion for summary judgment seeking dismissal of all of Plaintiffs' claims. Dkt. 33. Plaintiffs have responded. Dkt. 43. Defendants have filed a reply. Dkt. 47.

**B. Factual Background**

1. Cameron's Collision with the Turnstile

The parties agree the underlying incident in this case occurred on May 22, 2020 as Cameron was returning to his cell from the gym and yard. Dkt. 45 at ¶3 (Cameron Dec.); Dkt. 37 at ¶ 6 (Cammer Dec.). As described by non-defendant Corrections Officer Jasper Umetsu, the procedure for movement requires the placement of two Response and Movement Officers outside of Tower 9, and a Corrections Officer in the tower who controlled the locks. Dkt. 36 at ¶¶ 4–7 (Umetsu Dec.). The procedure calls for a radio message to be transmitted from Base to the Tower 9 officer stating movement is open, upon which the tower officer confirms the message, unlocks the turnstiles, and announces over the public address system that inmates may move through the yard. *Id*. at 7; Dkt. 37 at ¶ 5 (Cammer Dec.). The turnstile light will turn from red to green when the turnstile is unlocked. Dkt 45 at ¶ 5 (Cameron Dec.).

Cameron was the first inmate to reach the turnstile; Cameron concedes he was in a hurry to return to his unit to shower, but denies he was running. Dkt. 34-1 at 47 (Cameron Deposition). Cameron contends the turnstile had a green light, showing it was unlocked, when he began to proceed through it—but it suddenly locked, causing him to collide with the turnstile and to break two of his teeth. Dkt. 45 at ¶¶ 7–10. (Cameron Dec.) Cameron testified he saw the indicator light go from red to green before he proceeded to the turnstile. *Id.* at ¶ 7. Cameron states other inmates observed the incident and support his account. *Id.* at ¶ 10. However, Cameron has not submitted sworn statements from any of the witnesses identified in his Declaration.

Defendant Cammer, who was the Corrections Officer in Tower 9, asserts he had not

unlocked the turnstile at the time of the incident, and the light would have remained red.[4] Dkt. 34-1 at 65, 66 (Cammer Deposition). Other non-defendant corrections officers posted at the base of Tower 9 also report there had been no announcement the turnstile was open prior to the incident, and the turnstile was "still locked" at the time Cameron entered it. Dkt. 36 at ¶ 10 (Declaration of Jasper Umetsu); Dkt. 34-1 at 71 (30(b)(6) Deposition of Daniel White, recounting Incident Report of corrections officer Joshua Whitfield). Defendant Cammer states he had received the call from Main Control that inmate movement was open, and heard yelling as he was unlocking the turnstiles. Dkt. 37 at ¶ 6. Defendant Cammer avers he was turned away from the turnstile and was unaware of the incident until he was later informed an inmate had collided with the gate and was told to file a report. Dkt. 37 at ¶ 4 (Cammer Dec.); Dkt. 34-1 at 62 (Cammer Deposition). Defendant Cammer states he never unlocked the turnstile, and it "remained secure the whole time." Dkt. 34-1 at 65.

2. Cameron's Medical and Dental Treatment

Cameron received initial medical care on the day of the incident after he returned to his unit. Dkt. 34-1 at 49 (Cameron Deposition). Cameron states he was seen by medical, given some medication and returned to his unit. *Id*. Cameron's medical records show he reported his pain as 3 out of 10 and was given acetaminophen. Dkt. 34-1 at 29–30 (Medical Treatment Report). The next day, on May 23, 2020, Cameron was seen again, reporting increased pain (8 out of 9); he was given oxycodone and dental wax to apply to the affected teeth, and provided a Health Status Report calling for a soft diet. Dkt. 34-1 at 32 (Primary Encounter Report). A dental follow-up was requested for Cameron, including a skull x-ray. *Id*.; Dkt. 38 at ¶ 5 (McDaniel Dec.).

---

[4] Video from security cameras placed at the tower could have shown whether the light was red or green, but it was overwritten pursuant to the Department of Corrections' retention schedule. Dkts. 24-13, 24-9 at 4. The Court has denied Plaintiff's' motion for sanctions with respect to the overwriting of the video. Dkt. 40.

On May 27, 2020, Cameron had a dental examination by J. Hoag, D.D.S. Dkt. 45-1 at 2–3 (Dental Limited Examination). Cameron reported he was no longer in pain. *Id*. Dr. Hoag's examination record noted there was no pupal damage and indicated the "need for fills" was reviewed with Cameron. *Id*. at 3. The record states "treatment needed for fills" and identifies the "next visit" for "7 and 8 composite buildup." *Id*; *see also* Dkt. 34-1 at 78 (McDaniel Deposition). With respect to the next steps, the box "Patient told to watch callout" is checked. *Id*.

Cameron received his skull x-ray on May 29, 2020, which showed tooth Nos. 7 and 8 were chipped, but showed no other pathologies. Dkt. 38 at ¶ 6 (McDaniel Dec.).

Cameron was next seen for his dental issues on October 21, 2021, when he was seen by W. Walsh, D.D.S. Dkt. 35 at 10 (Dental Limited Examination).[5] During the period between his prior May 27, 2020 examination and the October 21, 2021 appointment, Cameron sent several kites and grievances inquiring about the status of his treatment.[6] Cameron filed grievances on August 28, 2020 and September 19, 2020 complaining of Cammer's conduct and requesting repair of his teeth. Dkt. 45-1 at 6, 7. Cameron also filed medical kites asking when he could "get [his] teeth fixed" on April 18, 2021, June 7, 2021 and August 4, 2021; each time he was told he was "on the list" and should "watch the callout." Dkt. 45-1 at 8, 9, 10.

Dr. Walsh's record of Cameron's October 20, 2021 examination shows fractures of tooth Nos. 7 and 8, but "no pulp exposure" on either, and "no formation of abcess." Dkt. 35 at 10

---

[5] The Declaration of Joy McDaniel, which discusses Cameron's treatment records, states this appointment was on October 21, 2020. Dkt. 38 at ¶ 10. As the record of the visit is dated October 21, 2021, the Court concludes Dr. McDaniel's reference to October 21, 2020 is a typographical error.

[6] The Court notes that at some point during this period, Plaintiff was transferred from the Washington State Reformatory, where his initial injury occurred, to Clallam Bay Corrections Center—as reflected by the facilities listed on his grievances and kites. *See* Dkt. 45-1 at 6 (August 28, 2020 grievance at "WSR"); Dkt. 45-1 at 8 (April 18, 2021 kite at "CBCC"). The Declaration of Joy McDaniel notes a transfer during this period, but appears to contain scrivener's errors, as it mentions a facility not reflected on the documents and mentions two different time periods. *See* Dkt. 38 at ¶ 9.

(Dental Limited Examination). The notes observe "slightly widened PDL and pulpitis." *Id*. Dr. Walsh noted the "treatment recommended is currently out of the scope of DOC for full crown coverage. Composite build-ups can be performed on 7 and 8." *Id*. Cameron was advised he would need to seek offender paid healthcare if he preferred crowns. *Id*. Cameron was also advised of the possibility of increased symptoms and necrosis if he did not pursue restoration with either composite buildups or crowns. *Id*. Cameron was instructed to kite for his next visit. *Id*.

Cameron refused the offered treatment with composite buildup. Dkt. 34-1 at 52 (Cameron Deposition). He was next seen by Dr. Walsh on March 31, 2022, where he again declined treatment with composite buildup. Dkt. 35-1 at 12 (Dental Examination); Dkt. 38 at ¶ 12 (McDaniel Dec.). In March, 2023, Cameron expressed interest in obtaining the composite build-up treatment, which he is now pursuing. Dkt. 38 at ¶ 13 (McDaniel Dec.); Dkt. 34-1 at 53 (Cameron Deposition).

Defendants have submitted evidence from their 30(b)(6) witness, Joy McDaniel, D.M.D, who is the Chief of Dentistry for the Washington State Department of Corrections. Dkt. 34-1 at 74–86 (McDaniel Deposition). Cameron did not submit evidence from a medical or dental expert. *See* docket.

Dr. McDaniel testified treatment options for an injury like Cameron's are restoration with composite resin, or the placement of crowns. Dkt. 34-1 at 75 (McDaniel Deposition). According to Dr. McDaniel, each has advantages and disadvantages. *Id*. Composite resin is a tooth-colored material that is strong enough to last many years, depending on the patient. *Id*. Aesthetically, resins match what normal teeth would look like. *Id*. at 84. Resins can last as long as 15 years—

and most issues that occur are "more aesthetic" in that the resins "start to stain," rather than problems with breakage *Id*. at 76.

Another option is crowns, which—depending upon the patient—may have greater longevity but also have the disadvantage that more of the natural tooth must be removed. *Id*. at 75. Dr. McDaniel testified that, while gold crowns would last the longest, they are not covered by the state health plan applicable to prisoners—nor are they covered for non-prisoner insureds covered by the state plan. *Id*. at 81. Both composites and metal crowns function similarly to natural teeth—but neither would function exactly like them. *Id*. Leaving chipped teeth untreated can result in increased pain and discomfort, and an increased risk of nerve issues if cavities form. *Id*. at 55.

## II. DISCUSSION

### A. Legal Standard

#### 1. Summary Judgment

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The moving party bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by presenting evidence that negates an essential element of the nonmoving party's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at

trial. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party bears the burden at trial, it can meet its initial burden by presenting evidence sufficient to demonstrate that no reasonable trier of fact could find for the nonmoving party; the evidence presented must establish beyond controversy every essential element of the claim. *S. California Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888–89 (9th Cir. 2003).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute. *Id.* at 252. Likewise, the nonmoving party cannot "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

Allegations based merely on the plaintiffs' belief are insufficient to oppose summary judgment, as are unsupported conjecture and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *McElyea v. Babbitt*, 833 F.2d 196, 197–98 n.1 (9th Cir. 1987). In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, and may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S. at 248.

2. Section 1983 Standard

To sustain a § 1983 civil rights claim, Cameron must show (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was

proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he or she was legally required to do that caused the deprivation complained of. *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

"The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Vicarious liability may not be imposed on supervisory employees for the acts of their subordinates in an action brought under 42 U.S.C. § 1983. *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013). A supervisor may be held liable under § 1983 only "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Jackson* v. *City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).

**B.      Defendants' Motion to Strike**

As a threshold matter, Defendants seek to strike portions of Cameron's Declaration (Dkt. 45) on the basis they contain inadmissible hearsay or speculative testimony.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed. R. Civ. P. 56(c). Admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible in evidence, and must show the declarant or affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). They must also be signed under penalty of perjury. 28 U.S.C. § 1746.

At the summary judgment stage, the Court is focused on the admissibility of the content, rather than the form, of the evidence. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003), *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56."). Thus, even declarations that contain hearsay may be considered at summary judgment if the content could be presented in admissible form at trial. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004). However, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2), advisory comm. note to 2010 Amendments.

Finally, objection that evidence is irrelevant, speculative, argumentative, vague and ambiguous, or constitutes an improper legal conclusion is duplicative of the summary judgment standard itself. *See Burch v. Regents of Univ. of California*, 433 F.Supp.2d 1110, 1119–20 (E.D. Cal. 2006). Summary judgment can only be awarded when there is no genuine dispute of *material* fact. *See* Fed. R. Civ. P. 56. "The Court cannot rely on irrelevant facts, and thus relevance objections are redundant." *Gaub v. Pro. Hosp. Supply, Inc.*, 845 F. Supp. 2d 1118, 1128 (D. Idaho 2012).

Defendants first seek to strike paragraphs 11, 12 and 13 of Cameron's Declaration, Dkt. 45, on the ground they are not made on personal knowledge and comprise inadmissible hearsay statements of third party declarants. In each of these paragraphs, Cameron recounts statements by third parties about either their observations of the turnstile incident or their prior experiences with "pranks" allegedly perpetrated by Defendant Cammer. Each contested paragraph recounts unsworn, out of court statements by third parties about facts, of which Cameron has no personal

knowledge and which Cameron offers for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). The record before the court does not show the statements fall within any of the definitional exclusions or exceptions to the hearsay rule. *See* Fed. R. Evid. 801(d), 803, 804. Moreover, the record does not establish the statements could be presented in an admissible form at trial; there is no indication any of the declarants (one of whom is not identified by name) would be available to be called as a trial witness. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("But here, JL Beverage has not argued that the hearsay declarants would be available to testify at trial, or that its hearsay evidence would be admissible at trial in some other form").

The third-party statements set forth in paragraphs 11, 12 and 13 of Cameron's Declaration are inadmissible and the Court will not consider them.

Paragraph 15 repeats (without attribution) one of the third-party hearsay statements made in ¶ 11. The Court will not consider that portion of ¶ 15—namely, the assertion Defendant Cammer "was laughing right after the incident"—because it is premised upon hearsay and is not based on Cameron's personal knowledge.

The remainder of ¶ 15 and ¶8, both of which Defendants challenge as speculative, need not be stricken, as speculative evidence is precluded by the summary judgment standard itself.

**C.      Excessive Force Claim**

Cameron contends Defendant Cammer used excessive force by suddenly re-locking the turnstile as Cameron approached. Dkt. 17 at 4. Defendants deny the turnstile was ever unlocked before Cameron accidentally collided with it, but also argue Cameron has failed to adduce evidence Defendant Cammer acted maliciously and sadistically. Dkt. 33 at 8–9.

"When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment." *Clement v. Gomez*, 298

F.3d 898, 903 (9th Cir. 2002). However, "[f]orce does not amount to a constitutional violation in this respect if it is applied in a good faith effort to restore discipline and order and not 'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (*quoting Whitley v. Albers,* 475 U.S. 312, 320–321 (1986)); *see also Wilkins v. Gaddy,* 559 U.S. 34, 40 (2010) (to prevail on an excessive force claim, a plaintiff must allege "not only that the assault actually occurred but also that it was carried out maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline").

Cameron contends defendant Cammer subjected him to excessive force by suddenly re-locking the turnstile after initially opening it. Dkt. 45 at ¶ 8. Defendant Cammer contends he never unlocked the turnstile. Dkt. 34-1 at 65. Cameron has submitted his sworn testimony that the light indicating the turnstile's status was green when he entered it. Dkt. 45 at ¶ 7. Defendants, on the other hand, have submitted evidence there had been no announcement the turnstile was open prior to the incident, and the turnstile remained locked. Dkt. 36 at ¶ 10; Dkt. 34-1 at 71. There is therefore an issue of fact whether the turnstile was locked or unlocked—and whether the indicator light was red or green—when Cameron entered the turnstile.

But an issue of fact as to whether or not the turnstile was locked is not sufficient to avoid summary judgment. Instead, Cameron must also adduce competent evidence that Defendant Cammer purposefully unlocked and relocked the turnstile and did so "maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992).

Cameron has not met this standard. Cameron's argument on this issue relies solely on his own Declaration. Dkt. 43 at 7. But Cameron admitted at his deposition that he has "no . . . personal evidence that Officer Cammer intentionally turned the turnstile off." Dkt. 34-1 at 56. Cameron also conceded that he could not see Defendant Cammer from the turnstile:

      A. No, you cannot see him unless he is up to the window of that tower. And even then it's black; you can't really see him.
Q. So you can't tell where the guards are when they're in the tower?
A. No.
Q. So on the date in question, could you actually see Officer Cammer?
A. I could not see Officer Cammer.

Dkt 34-1 at 56. Thus, Cameron's statement in his Declaration that "once I walked into the turnstile, CO Cammer locked the turnstile" (Dkt. 45 at ¶ 8) is not based on personal knowledge. It is speculative and conclusory, and therefore insufficient to defeat summary judgment. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact").

Cameron also asserts that the fact the turnstile lock is operated manually, combined with a hearsay report by a third-party declarant of Defendant Cammer's demeanor after the collision (which this Court has stricken—*see* section II.B. above), "show that [Cammer's] actions were intentional and meant to be cruel." Dkt. 45 at ¶ 15. This statement, also, is wholly speculative and is not competent evidence. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) ("[a] plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive.").

Cameron has the burden of proof at trial to show (1) the turnstile was unlocked when Cameron entered it; (2) Defendant Cammer intentionally re-locked it; and (3) Defendant Cammer's mental state in re-locking the turnstile was malicious and sadistic for the very purpose of causing harm. Here, there is competent disputed evidence only as to the first issue; Cameron has submitted no competent evidence supporting the second and third points and supplies only speculation. This is insufficient to avoid summary judgment. *Carmen*, 237 F.3d at 1028.

The Court therefore recommends Cameron's Eighth Amendment claim for excessive force be dismissed.

**D.     Medical Care Claims**

Cameron contends he received inadequate and delayed treatment of his broken teeth. Dkt. 17. Defendants contend Cameron received appropriate medical treatment. Dkt. 33 at 11–13.

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The two-prong test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (*quoting McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

The defendants must have known of and disregarded an excessive risk to the Cameron's health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference is shown when prison officials consciously disregard an excessive risk of harm to an inmate's health or safety. *Id*. at 838–40. It is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause[.]" *Wilson v. Seiter*, 501 U.S. 294, 299 (1991).

Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or [ ] may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). However, delay in providing a prisoner treatment, standing alone, does not constitute an Eighth Amendment

violation unless the delay causes harm. *See McGuckin,* 974 F.2d at 1059; *Amarir v. Hill*, 243 F. App'x. 353, 354 (9th Cir. 2007).

Finally, a mere difference of opinion about treatment between Cameron and prison medical authorities "does not give rise to a § 1983 claim." *Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016). "Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). A prisoner must instead show the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir. 1996) *overruled in part on other grounds by Perlata v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *see also Toguchi*, 391 F.3d at 1058.

1. Treatment Method

Cameron asserts he received inadequate care for his broken teeth because he was not offered metal crowns, the treatment recommended by his second treating dentist, Dr. Walsh, unless he paid for them himself. Dkt. 43 at 8. Defendants argue the refusal to provide crowns does not rise to the level of deliberate indifference because Cameron was offered, and refused, an alternative treatment of composite build-ups—and he merely disagrees with the chosen course of treatment. Dkt. 33 at 12.

Cameron shows no more than a difference of medical opinion, which is insufficient to establish deliberately indifferent medical care. While the record of Cameron's October 20, 2021 visit with Dr. Walsh indicates she recommended full crowns, it also shows she offered an alternative treatment, composite build-ups. Dkt. 35 at 10. There is no record Dr. Walsh considered this option unacceptable. Moreover, the record of Cameron's original dental

treatment visit with Dr. Hoag on May 27, 2020 reflects that the proposed treatment at that visit, and the recommended follow up, was to place composite build-ups. Dkt. 45-1 at 3.

Cameron has not submitted any evidence demonstrating composite build-ups are a medically unacceptable treatment for his broken teeth. In contrast, Defendants have submitted the evidence of Dr. McDaniel, who testified composite build-ups are a recognized treatment option that can last as long as 15 years, and require less destruction of a patient's natural tooth than the placement of a full crown. Dkt. 34-1 at 75–76.

Cameron has failed to show the proposed treatment option was medically unacceptable and has established no more than a difference of medical opinion. This is insufficient to show deliberate indifference. *Jackson*, 90 F.3d at 332 ("where a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law.").

The Court therefore recommends dismissal of Cameron's Eighth Amendment claim based upon the method of treating his broken teeth.

2. Delay

Cameron also contends his treatment was deliberately indifferent because it was delayed. Dkt. 43 at 8. Defendants argue any delay was due to Cameron's refusal to pursue offered treatment and, in part, to COVID-19 pandemic shut-downs.

Delayed medical treatment does not rise to an Eighth Amendment violation unless it is deliberately indifferent to a serious medical need, and the delay causes "substantial harm." *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). Cameron has established neither of these.

Here, Cameron does not contend his immediate post-accident treatment was inadequate. Instead, he challenges the delay between his initial dental examination by Dr. Hoag on May 27,

2020 and his second examination by Dr. Walsh on October 20, 2021. Dkt. 43 at 8. Cameron notes he was told after his visit with Dr. Hoag to "watch for callout" for his follow-up appointment, but never received one. Dkt. 45 at ¶¶ 18–20. Moreover, Cameron has submitted evidence showing he attempted on multiple occasions to obtain treatment, submitting numerous grievances and kites requesting his teeth be repaired. *Id*. at ¶ 21.

Cameron does not, however, demonstrate that the gap between his dental visits was the product of deliberate indifference. Instead, the parties agree the delays were at least partially attributable to COVID-19 related shutdowns of non-emergency care.[7] *See* Dkt. 45 at ¶ 20; Dkt. 34-1 at 82–83. In addition, it appears Cameron transferred to a different facility at some point during that period and would have needed to establish care with a new provider. *See* footnote 6, above.

Moreover, while Cameron did continue to seek treatment, the evidence suggests he would not have pursued the treatment proposed at the May, 2020 appointment—which was composite build-ups. *See* Dkt. 45-1 at 3. Cameron concedes he has refused to pursue composite build-ups, and has only decided to accept that method of treatment within the past several months. Dkt. 34-1 at 52–53. Instead, Cameron acknowledges he delayed his acceptance of the offered build-ups while he tried to obtain full crowns. *Id*. Thus, there is no evidence Cameron would have been treated any earlier even if he had been able to obtain a follow-up appointment closer to his initial May, 2020 appointment with Dr. Hoag.

Finally, Cameron has presented no evidence the delay caused the "substantial harm" required to establish an Eighth Amendment violation. *Wood*, 900 F.2d at 1335. Both in May,

---

[7] Dr. McDaniel testified Plaintiff's injury did not present an emergency. Dkt. 34-1 at 83.

2020 and in October, 2021, Cameron's examinations showed no pupal exposure. *See* Dkt. 45-1 at 3; Dkt. 35 at 10. Cameron reported no pain. *Id*. The parties agree a long-term failure to treat the broken teeth could result in increased risks of future complications. *See* Dkt. 43 at 8 (Cameron's reference to "risk of complications"); Dkt. 34-1 (risks of leaving teeth untreated could include discomfort and increased risk of nerve issues if cavities form). *Id*. at 55. However, there is no evidence Cameron experienced any such difficulties between May, 2020 and October, 2021.

Cameron has not submitted any evidence a delay in treatment caused him substantial harm. The Court therefore recommends dismissal of Cameron's Eighth Amendment claim arising out of his assertion his treatment was delayed.

**E. Defendants' Additional Arguments for Dismissal of Section 1983 Claims**

Defendants argue they are entitled to qualified immunity and that Defendant Washington State should be dismissed because it is not a "person" under § 1983 and has not waived its Eleventh Amendment immunity. Dkt. 33 at 13–15. Because the Court recommends dismissal of Cameron's § 1983 claims on other grounds, the Court does not analyze these issues.

**F. State Law Claims**

Cameron asserts state claims for negligence (First Claim for Relief) and the intentional tort of assault and battery (Second Claim for Relief). Dkt. 17. Cameron and Jessica also assert a state claim for the tort of loss of consortium. *Id.* at ¶4.2 As discussed above, the Court recommends dismissal of all Cameron's federal claims. The Court therefore recommends supplemental jurisdiction over the remaining state law claims be declined and the state claims be remanded to state court.

A district court may exercise supplemental jurisdiction over state law claims arising from the same set of operative facts that supports a federal claim. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009) (citing 28 U.S.C. §§ 1367(a), (c)); *Artis v. District of*

*Columbia*, 583 U.S. 71 (2018). However, "[w]hen district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims." *Artis*, 583 U.S. at 74. *See also Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (suggesting that a district court may, but need not, decide *sua sponte* whether to continue exercising supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) once all federal law claims have been dismissed).

As stated above, the Court finds Cameron has failed to establish his federal claims and recommends their dismissal with prejudice. The remaining claims raise issues solely of state law, and the state courts will therefore be more familiar with the law governing Cameron's claims. The parties' discovery and dispositive motion briefing will be equally useful to the resolution of this action in state court. Therefore, as there are no federal claims remaining, the Court finds it appropriate to decline the exercise of supplemental jurisdiction over the remaining state law claims.

In a removed case in which a federal court declines to exercise supplemental jurisdiction, the court may either dismiss the state law claims without prejudice or remand them to state court. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988). Here, the interests of judicial economy, convenience, fairness and comity support a remand to state court. Accordingly, the Court recommends Cameron's state law negligence and assault and battery claims and Plaintiffs' loss of consortium claim be remanded to the Thurston County Superior Court.

## III. CONCLUSION

For the above stated reasons, the Court recommends Defendants' motion for summary judgment (Dkt. 33) be granted as to Cameron's federal claims pursuant to 42 U.S.C. § 1983 and those claims be dismissed with prejudice. The Court further finds it appropriate to decline the

exercise of supplemental jurisdiction over all state law claims, and recommends those claims be remanded to the Thurston County Superior Court.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on September 15, 2023 as noted in the caption.

Dated this 25th day of August, 2023.

David W. Christel
United States Magistrate Judge